AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California

FILED

NOV 2 8 2017

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
) Case No. **17MJ4497**
Information associated with Facebook user ID Shane. )
Faires that is stored at premises controlled by Facebook )
Inc., 1601 Willow Road, Menlo Park, CA 94025 )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A
(INCORPORATED HEREIN)**

located in the ____Northern____ District of ____California____, there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B
(INCORPORATED HEREIN)**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 2252 and 2252A | Possession, Receipt & Distribution of Child Pornography |

The application is based on these facts:

**SEE AFFIDAVIT OF SPECIAL AGENT BRIAN A. BENSON (INCORPORATED HEREIN)**

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

BRIAN BENSON, SPECIAL AGENT, NCIS
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/28/2017

*Judge's signature*

City and state: San Diego, CA

Honorable Andrew G. Schopler, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Items to be Searched

This warrant applies to information associated with the following Facebook user ID:

    a. https://www.facebook.com/Shane.Faires

       https://facebook.com/profile.php?id=100019704360040

    **("Target ID")**

The **Target ID** is currently stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered at 1601 Willow Road, Menlo Park, CA 94025.

1

# ATTACHMENT B

## Items to be Seized

I. Service of Warrant

The officer executing the warrant shall permit Facebook, as custodian of the computer files described in Section II below, to locate the files relevant to Attachment A and copy them onto removable electronic storage media and deliver the same to the officer or agent.

II. Information to be disclosed by Facebook

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

a. All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

b. All activity logs for the account and all other documents showing the user's posts and other Facebook activities;

c. All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them;

d. All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the

1

groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

e. All other records of communications and messages made or received by the user, including all private messages, chat history, video calling history, and pending "Friend" requests;

f. All "check ins" and other location information;

g. All IP logs, including all records of the IP addresses that logged into the account;

h. All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

i. All information about the Facebook pages that the account is or was a "fan" of;

j. All past and present lists of friends created by the account;

k. All records of Facebook searches performed by the account;

l. All information about the user's access and use of Facebook Marketplace;

m. The types of service utilized by the user;

n. The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

o. All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

p. All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

III. <u>Information to be seized by the government</u>

The search of the data supplied by the ISP pursuant to this warrant will be conducted by the Naval Criminal Investigative Service as provided in the "Procedures For Electronically Stored Information" of the affidavit submitted in support of this search warrant and will be limited to the period of July 1, 2017 to the present and to the seizure of:

a. Communications, records, and attachments tending to discuss the sexual exploitation of children, demonstrate a sexual interest in children, and/or demonstrate the possession and distribution of child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A;

b. Communications, records, and attachments tending to identify the user of the account and any co-conspirators involved in the activities described in Paragraph III. a. above; and

c. Communications, records, and attachments that provide context to any communications described above, such as electronic mail sent or received in temporal proximity to any relevant electronic mail and any electronic mail tending to identify users of the subject accounts;

which are evidence of violations of 18 U.S.C. §§ 2252 and 2252A.

IV. <u>Method of delivery</u>

Facebook Inc. shall disclose responsive data, if any, by sending to NCIS via the attention of the agent executing this warrant, 120101 De Luz Road, Box 555238, Camp Pendleton, California 92055 using the US Postal Service or another courier service, notwithstanding 18 U.S.C. 2252A or similar statute or code.

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Brian Benson, Special Agent (SA), Naval Criminal Investigative Service (NCIS), being duly sworn, hereby state as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant for information associated with a Facebook user ID that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. As described further in Attachment A, this request is made to search the following Facebook user ID ("**Target ID**"):

   a. https://www.facebook.com/Shane.Faires
   https://facebook.com/profile.php?id=100019704360040

from July 1, 2017 to the date of this warrant for items that constitute, evidence, fruits, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, as described in Attachment B. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook, to disclose to the government, records and other information in its possession, pertaining to the subscriber or customer associated with the **Target ID**.

2. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 2252 and 2252A have been committed by Billie Joe MORTON ("MORTON"). There is also probable cause to believe that a search of the **Target ID** as described in Attachment A will produce evidence and constitute instrumentalities of the aforementioned crime, as described in Attachment B.

3. The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of

1

documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining a search warrant for the **Target ID**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## BACKGROUND INFORMATION ON FACEBOOK

4. Facebook is a corporation that owns and provides a free-access online social networking service and is headquartered in Menlo Park, California. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

5. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

6. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's

account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

7. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

8. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

9. Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For

3

Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

10. Facebook users can exchange private messages on Facebook with other users. These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook. These chat communications are stored in the chat history for the account. Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

11. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

12. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

13. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

14. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or

adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

15. Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services.

16. The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page. Gifts cost money to purchase, and a personalized message can be attached to each gift. Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

17. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

18. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

19. Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile: profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

20. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

21. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

22. Facebook reports any instance of child sexual exploitation that it discovers in its user accounts to the National Center for Missing and Exploited Children (NCMEC). The report that Facebook files with NCMEC includes the screen/user name, email address of the user who posted the images, as well as associated URL and/or IP address at the time that content was uploaded to a Facebook account. This report is called a CyberTipline Report and it is assigned a CyberTipline Report number, which Facebook uses to reference the incident.

23. NCMEC analysts are trained to analyze the information that is reported to them by Facebook. The analysts can identify the ISP from the IP number. The geographical location in which a person's computer connects to the ISP's network

6

is called the Point of Presence (hereafter referred to as PoP). Generally, IP numbers are mapped to PoP's or a geographic area. By analyzing the IP, analysts can often determine the geographical location of the PoP that was accessed at the time the user was online with Facebook and sent the offending content.

24. The Federal Government's Office of Juvenile Justice and Delinquency Prevention (OJJDP) provides grants throughout the country to local law enforcement agencies to fund task forces, aimed at combating child sexual exploitation on the Internet. These task forces are referred to as an "ICAC," short for Internet Crimes Against Children. ICAC task forces act as liaisons between NCMEC and other local law enforcement agencies.

25. When a NCMEC analyst determines the probable geographical location of a PoP, he or she will route the CyberTipline Report information provided to it by Facebook to the ICAC nearest to the PoP.

**EXPERIENCE AND TRAINING**

26. I am a Special Agent with the Naval Criminal Investigative Service (NCIS), and have been so employed since April 2014. I am currently assigned to a Family and Sexual Violence billet within the NCIS Marine Corps West Field Office, Camp Pendleton, CA. I received a Bachelor of Arts degree in International Studies from the University of Wisconsin-Madison and a Master of Public Affairs degree from Park University. I served in the United States Air Force as an intelligence officer, from which I honorably separated at the rank of captain in 2009. I thereafter held employment with the United States Park Police in Washington, D.C., during which I completed the Uniformed Police Training Program at the Federal Law Enforcement Training Center (FLETC) in Glynco, GA. Since beginning employment with NCIS, I have also completed the Criminal Investigator Training Program at FLETC in Glynco, GA as well as NCIS' Special Agent Basic Training Program. I also serve as the NCIS Marine Corps West Field Office

representative to the San Diego Internet Crimes Against Children (ICAC) task force. The task force includes members of the San Diego Police Department, San Diego County Sheriff's Department, U.S. Postal Inspection Service, Federal Bureau of Investigation, Homeland Security Investigations, U.S. Attorney's Office, and the San Diego County District Attorney's Office. As an NCIS Special Agent assigned to the ICAC task force, I investigate criminal violations relating to child exploitation and child pornography, including violations pertaining to the illegal production, distribution, receipt and possession of child pornography, in violation of 18 U.S.C. §§ 2252 and 2252A. I have had the opportunity to observe and review numerous examples of child pornography (as defined in 18 U.S.C. § 2256).

## FACTS IN SUPPORT OF PROBABLE CAUSE

27. On August 7, 2017, Marine Corps Police Department on-board Camp Pendleton, CA detained MORTON, an active duty U.S. Marine, who was suspected of having utilized a government-owned computer – in which there is no reasonable expectation of privacy – to access a Facebook profile through which images of suspected child pornography had been exchanged.

28. NCIS agents responded to the Single Marine Program Recreation Center in the Las Pulgas area of Camp Pendleton, CA – within exclusive federal jurisdiction, located in the Southern District of California – where they interviewed a Marine Witness ("MW"). MW reported that earlier in the day he had utilized computer number thirteen within the Single Marine Program's "internet café" to conduct a job search. While on the computer, MW observed a tab displayed in the lower right corner of the screen, which he clicked on, believing it to be related to his job search. MW noted the Facebook profile page of **Target ID** opened and displayed five separate Facebook Messenger conversations. MW scrolled through Messenger conversations between **Target ID** and two other individuals in which "kids pics" were being discussed. MW also saw images in the conversations of what he stated

8

appeared to him to be those of young children that were nude and/or taking off their clothes. MW recognized the profile picture depicted on the Facebook page of **Target ID** to be a photograph of MORTON, who MW had previously worked with in 2016.

29. NCIS agents conducted a cursory review of computer number thirteen and viewed the Facebook profile page of **Target ID**, wherein messages depicting suspected child pornography were observed and photographed prior to the computer being seized as evidence. Agents reviewed the content of the five open Messenger conversations but did not otherwise manipulate the Facebook profile. Furthermore, at the time agent reviewed the Messenger conversations there was no indications that any data was being pulled/downloaded from Facebook. NCIS discovered conversations wherein the **Target ID** sent and/or received photographs and videos of suspected child erotica and child pornography with two other Facebook users ("KG" and "ML").

30. In exchanges beginning on July 24, 2017 with KG, **Target ID** asked for – among other things – "incest pics" and "nudes", after which KG sent a photograph of two prepubescent naked females standing in a gymnasium, posing for the camera. **Target ID** thereafter acknowledged the photograph, asking KG if he had "ones that have tits." I have provided the image as EXHIBIT 1 to the Magistrate Judge for review.

31. Similarly, **Target ID** and ML began an exchange on July 25, 2017 during which they discussed exchanging photographs, to which ML later claimed to have photographs of his fourteen and nineteen year old sisters, as well as "some other stuff." The following exchanges of photographs took place between **Target ID** and ML:

    a. On July 27, 2017, **Target ID** sent ML a photograph, which appears to depict a minor female wearing a black dress and heels. The photograph,

9

1 taken from behind and below the posing female, focuses on her clothed pubic region.
2 In the photograph, the apparent minor female is holding one finger over her open
3 lips in a manner appearing to be sexually suggestive.

       b.    In response to the black dress photograph, ML sent **Target ID** five photographs. Four of which depicted women bearing exposed developed breasts. ML then stated "And some little kids pics."

       c.    ML thereafter sent four additional photographs, including two which were close-up photographs of an apparent pre-pubescent female(s) vulva. I have provided the two images as EXHIBITS 2 and 3 to the Magistrate Judge for review.

       d.    **Target ID** then sent ML approximately ten photographs in response. The pictures included a photograph of a prepubescent female child of apparent Indian descent, sitting outside in a yellow dress with her legs spread apart showing a full view of the child's pubic region. The child's dress is pulled up, exposing her genitalia in the center of the photograph. I have provided this image as EXHIBIT 4 to the Magistrate Judge for review.

       e.    ML reciprocated by sending approximately six more photographs and three videos. One of the videos depicted an apparent prepubescent female child wearing a light green shirt, lying on her back. The child is naked from the waist down and her legs are spread apart. The child is masturbating and her vulva and anus are visible throughout the majority of the approximately fifty-three second video.

       f.    Following receipt of a photograph depicting an apparent pubescent female spreading her labia, **Target ID** asks ML how old the female is. ML responds that she is seventeen; **Target ID** notes, "She's sexy."

32. NCIS Agents interviewed MORTON on August 17, 2017, during which he admitted he had created the **Target ID** Facebook profile in approximately

mid-July 2017. MORTON further admitted sending approximately five to ten images and conversely receiving approximately ten to fifteen images and three videos of what he believed to be child pornography from ML. MORTON further estimated he sent approximately ten to fifteen images to KG (and therein received approximately the same number of images) of what he believed to be child pornography. MORTON defined child pornography as photographs or videos depicting children under the age of eighteen who are often posed for the camera and who are either nude, wearing "lingerie-type" apparel, or otherwise clothed in see-through material. He admitted to receiving three videos from ML and described receiving a video of a girl stripping, another of a man having intercourse with a girl, and a third depicting a masturbating girl who MORTON described as "pretty young" based upon her face, but then estimated to be seventeen or eighteen years old.

33. Data recovered during a preliminary forensic examination of computer number thirteen revealed fragments of two (of three) videos which appear to be videos that were initially photographed by NCIS Agents and later described by MORTON. One video depicted an apparent pubescent teen stripping and masturbating. The second video was identified as the video MORTON had received from ML, which depicted a masturbating prepubescent female child in a green shirt.

34. Pursuant to a request submitted by NCIS, the National Center for Missing and Exploited Children (NCMEC) conducted a query of its databases on November 01, 2017 for information related to **Target ID**, ML, and KG. NCMEC's queries revealed five CyberTipline Reports, which NCMEC had received from Facebook in August 2017 for incidents that occurred between approximately July 25, 2017 and July 31, 2017. **Target ID** was identified in three of the CyberTipline Reports, while ML was identified in the remaining two.

35. The CyberTipline Reports indicated **Target ID** sent a photograph (which appears to be the same photograph previously identified as EXHIBIT 2) to a

11

third, previously unidentified, Facebook user ("MO") on July 25, 2017. **Target ID** additionally sent MO three additional photographs, including the photograph previously identified as EXHIBIT 4.

36. The CyberTipline Reports further revealed MO sent to **Target ID** on July 26, 2017 the same, previously described, video of the masturbating prepubescent female child in a green shirt, which **Target ID** thereafter again received on July 27, 2017 from ML. **Target ID** was additionally identified as having received from MO the previously described videos of a man having intercourse with a girl, and an apparent pubescent teen stripping and masturbating, which **Target ID** had also received on July 27, 2017 from ML.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

37. Federal agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation. The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook. The impact on Facebook's business would be severe.

38. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section II of Attachment B. Upon receipt of the information described in Section II of Attachment B, government-authorized persons will review that information to locate the items described in Section III of Attachment B.

39. Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data

analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the segregation and extraction of data will complete the analysis and provide the data authorized by this warrant to the investigating team within ninety (90) days of receipt of the data from the service provider, absent further application to this court.

40. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic communications that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

41. All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification, segregation and extraction of data within the scope of this warrant.

## GENUINE RISK OF DESTRUCTION OF DATA

42. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills. In this case, agents sent a preservation request to Facebook on August 7, 2017, ordering the preservation of data associated with the **Target ID.** Facebook confirmed receipt of the request on August 8, 2017.

## PRIOR ATTEMPTS TO OBTAIN DATA

43. The forensic examination of data extracted from computer number thirteen remains on-going. An attempt to recover data from MORTON's phone is additionally underway pursuant to a Command Authorization for Search and Seizure. Data which may be recovered by the extractions may include remnants of photographs or videos which were either downloaded or cached to the devices, however actual content of the **Target ID's** Facebook profile to include dates, times,

13

and content of Messenger exchanges – may not be recovered by forensic examination alone. The United States has not otherwise attempted to use other means to obtain the data sought via this warrant application.

## CONCLUSION

44. In conclusion, based upon the information contained in this affidavit, I have reason to believe that evidence, fruits and instrumentalities relating to violations of 18 U.S.C. §§ 2252 and 2252A, as more particularly described in Attachment B, are located at the location described in Attachment A.

_____
Brian Benson, Special Agent
Naval Criminal Investigative Service

Subscribed and sworn to before me this 28th day of November 2017.

_____
HON. ANDREW G. SCHOPLER
United States Magistrate Judge